**INDUSTRIAL COMMUNICATIONS & ELECTRONICS, INC., Plaintiff,**

v.

**James O'ROURKE, Arthur Gagnon and John Rosa as they are members of the Town of Somerset Zoning Board of Appeals, Defendants.**

Civil Action No. 05–12320–WGY.

United States District Court,
D. Massachusetts.

Oct. 16, 2008.

Clement Brown, Horvitz & Brilhante LLP, Fall River, MA, for Defendants.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

## I. INTRODUCTION

In 2005 Industrial Communications and Electronics, Inc[1]. ("Industrial") brought leasing telecommunications towers and tower sites after Industrial Communications & Electronics Inc. undertook a corporate reorganization in January 2006. For the purposes of

---

1. Industrial Communications & Electronics, Inc., the original plaintiff in the action, was succeeded by Industrial Tower and Wireless, a newly created entity that acquired the business of acquiring, permitting, owning, and

this action challenging the denial by the defendant Town of Somerset Zoning Board of Appeals ("ZBA") of its special permit application to install a telecommunications tower. Industrial sought relief pursuant to the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7) (1996) ("Telecommunications Act"), and under chapter 40 of the Massachusetts General Laws. The parties filed cross motions for summary judgment and agreed to treat these motions as a case stated. During the case stated hearing, held in 2006, Industrial agreed to explore other sites where it possibly could install the tower; the case was, thus, administratively closed. After exploring other sites, Industrial found but one alternative. It filed another request, which the ZBA also denied, for a special permit with the Town of Somerset as to this second site. Industrial now reopens this action arguing that the ZBA has no substantial evidence supporting the denial of a permit with regard to either site and that it has effectively prohibited the provision of wireless services in violation of the Telecommunications Act. Industrial further asserts any further attempts to obtain a permit would be futile. The parties have once again filed cross-motions for summary judgment that, with the agreement of the parties, the Court treats as a case stated.

### A. Procedural Posture

At the hearing on July 31, 2006, Industrial agreed to make additional efforts to locate alternative sites for a telecommunications facility. The case was administratively closed without prejudice to its being re-opened at the request of any party [Doc. No. 31].

On September 21, 2007, Industrial filed a Motion to Reopen Case [Doc. No. 34], a Motion to Supplement Complaint [Doc. No. 33], and an Amended Complaint ("Am. Compl.")[Doc. No. 32]. The Court granted

these motions. On October 5, 2007 the ZBA filed an Answer to the Amended Complaint [Doc. No. 37].

On March 14, 2008, the ZBA filed a Supplemental Cross–Motion for Summary Judgment [Doc. No. 41], a Supplemental Memorandum in Support of Defendants' Cross–Motion for Summary Judgment [Doc. No. 48], a Supplemental Statement of Material Facts [Doc. No. 42], and various affidavits in support [Doc. Nos. 43–47].

On that same day, Industrial filed a Supplemental Memorandum of Law in Support of the Motion for Summary Judgment ("Indus. Suppl. Mem. for S.J.")[Doc. No. 49], a Local Rule 56.1 Statement ("Indus. Stmnt. Facts") [Doc. No. 50], and affidavits in support [Doc. No. 52], including the affidavit of Donald Cody ("Cody Aff."). It further filed on March 17, 2008 another Memorandum of Law in Support of the Motion for Summary Judgment, which is virtually identical to the one already filed [Doc. No. 53]. On March 28, 2008, Industrial filed a reply brief [Doc. No. 54] and an Opposition to Defendants' Cross–Motion for Summary Judgment [Doc. No. 55], together with another statement of undisputed facts [Doc. No. 56] and affidavits in support. [Doc. Nos. 57–58].

### B. The Case Stated

■ The parties agreed in 2005 to treat this case as a "case stated." Therefore, the Court may, unlike in the context of summary judgment, engage in fact finding and may draw reasonable inferences based on the record to decide the case. *E.E.O.C. v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 603 (1st Cir.1995); *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 430 n. 7 (1st Cir.1992); *Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. and Urban*

this memorandum and order, both entities will be referred to as "Industrial."

*Dev.,* 768 F.2d 5, 12 (1st Cir.1985) (Breyer, J); *Federacion De Empleados Del Tribunal Gen. De Justicia v. Torres,* 747 F.2d 35, 36 (1st Cir.1984) (Breyer, J.).

### C. Federal Jurisdiction

This Court has jurisdiction to hear this case under 28 U.S.C. § 1331 because this action presents a federal question under the Telecommunications Act. The Court has supplemental jurisdiction over the Massachusetts state law claim pursuant to 28 U.S.C. § 1367.

### II. FINDINGS OF FACT

Industrial is a Specialized Mobile Radio licensee, providing a variety of land mobile communications services in New England. It provides communications services for commercial and public entities for which Industrial has erected systems of communications towers and facilities throughout Massachusetts and New England. Industrial is therefore a Personal Wireless Service Provider pursuant to 47 U.S.C. § 332(1) and a Public Service Corporation as defined by the Massachusetts Department of Telecommunications and Energy. The Federal Communications Commission ("FCC") authorizes Industrial to operate 70 discrete 900 MHz frequencies under separate license call signs for the provision of specialized mobile radio services for the Boston Major Trade Area ("BMTA"). As a BMTA licensee, Industrial has a limited period of time in which to build its stations. If it fails to meet the coverage requirements it risks losing its license. It also builds wireless service facilities, including communication towers, with the intent to lease space to providers as "co-location" sites to reduce tower proliferation and advance provision of wireless services.

In 2005 Industrial conducted propagation studies of radio frequency signals in Somerset, Massachusetts. Based on these studies, Industrial determined that a significant coverage gap existed in Somerset for all personal communications service and cellular service providers, particularly along Route 138 ("Coverage Gap"). Only sites within a defined area along Route 38 ("Search Area") could provide coverage to the Coverage Gap.

### A. The First Tower Site

After reviewing hundreds of properties in the Search Area, Industrial eventually located a 2.3 acre lot available for purchase that could adequately provide coverage in the Coverage Gap ("First Tower Site"). It was the only site that Industrial found suitable as it provided adequate coverage in the Coverage Gap, was available for purchase or lease, fully met the dimensional and set back requirements of the Somerset Zoning Bylaw ("By-law"), and was suitable for tower construction. The rest of the sites Industrial considered were either wetlands, located in residential zones, or could not meet the set back requirements of the By-law without variance. Industrial proposed to construct a 170–foot wireless telecommunications tower and an accompanying 100–by–100 foot equipment area. The site was set back 300 feet from the nearest residential property line. It would be enclosed by a ten-foot high chain link fence with barbed wire around the top fence and would be screened by landscaping consisting of six foot trees. It would not generate wastewater or involve in-site storage or disposal of toxic waste, and it would generate only approximately two vehicle trips per month for maintenance purposes.

The By-law, which establishes criteria for the issuance of special permits, requires a special permit for the construction and operation of a telecommunications facility with a communications tower. On September 9, 2005, Industrial submitted an application for a special permit which

was denied by the ZBA ("2005 Decision"). *See* Am. Compl. Ex. A.

On July 31, 2006 the Court heard the case as a case stated. At the hearing, Industrial agreed to make additional effort to locate alternative sites for the telecommunications facility. The case was administratively closed without prejudice to its being re-opened at the request of any party.

### B. Post–Hearing Developments.

After the hearing, between August 2006 and November 2007, Industrial undertook a comprehensive and diligent investigation of parcels of land in Somerset. It expanded its search ring from the first site and eventually examined 771 separate parcels.

For a parcel fully to be compliant with the By-law it should encompass at least 6.48 acres, so that a tower sited in the middle of the parcel would comply with the 300–foot residential property line setback requirement.[2] A square parcel of land would have to consist of approximately 8.26 acres (with 600–foot boundaries) in order to meet the 300–foot setback requirement.

Many of the parcels studied were, however, immediately excluded. All the parcels located within the Open Recreation zoning district, for example, had to be excluded because telecommunications towers are not allowed in this zone. Other than the First Tower site (Whestone Hill Road), the parcels within the Business zoning district had to be excluded because they would not meet the By-law tower height setback requirement.[3] The rest of the potential parcels were all located in the Residential zoning district. Most of these

are modest-sized lots that already have a family home built on them or do not meet the 300–foot residential lot line set back requirement. Parcels that were shown on the Mass GIS and Mass DEP websites as wetlands parcels were also excluded because of the physical limitation on construction.

There were various larger-sized parcels that potentially could support a telecommunication tower. These parcels were further investigated by Industrial. Of these parcels, many were not for sale, others were conservation lands that were not available for development, that were filled with wetlands, or that were unusable or inaccessible.

Industrial also met with the Somerset Water Department regarding the potential lease or purchase of Water Department land for a telecommunications site. *See* Cody Aff. Ex. 3 at Ans. No. 4.

### C. The Second Tower Site

Industrial located only one parcel, other than the original site, that was available for purchase and suitable for the construction of the tower in light of the necessary prerequisites of availability, constructability, and compliance with zoning and environmental regulations. This was a rectangular shaped parcel of 6.37 acres located within a Residential zoning district at 544 Elm Street in Somerset ("Second Tower Site"). A variance from the 300 foot setback requirement of the By-law was required in order to construct a tower on this site because residential property lines fell within the 300–foot setback.

---

**2.** A 300–foot radius around the telecommunications facility would create a circle consisting of 6.48 acres.

**3.** Section 7.6.2.b.1.a of the By-law requires that the "minimum distance from the base of

a wireless communications tower to any property line, building, active recreation or parking area shall be fifty percent (50%) of the height of the tower including any antennas or other appurtenances."

In May 15, 2007 Industrial performed a new propagation study of the original Coverage Gap to assess any changes in coverage. *See* Cody Aff. ¶¶ 4, 9. The May propagation study confirmed an ongoing significant gap in wireless coverage. T–Mobile performed an independent propagation study that confirmed existence of the gap.

In May 2007 Industrial filed an application for a special permit under Section 4.2.6(c) and 7.6.2 of the By-law and for a variance from the 300–foot setback requirement of Section 7.6.2.b.1.b of the By-law to construct a 170 foot telecommunication tower at the Second Tower Site. Industrial filed a Site Plan, a structural analysis of the tower, propagation studies of existing and proposed coverage patterns, drive test data, photo simulations, a complete alternative site analysis, a variance memorandum, and a full analysis of compliance with the Somerset By-law.

The Board held three public hearings on June 28, July 26, and August 16, 2007. After the last hearing, all three members of the Board voted to deny the special permit for the Second Tower Site, pointing out that a third site—the Cordeiro Site—was available ("2007 Decision"). *See* Am. Compl. Ex. B. The Second Tower Site is no longer available as the Purchase and Sale Agreement signed with the owners of the property expired in December 2007.

## III. RULINGS OF LAW

The claims at issue are: (I) an alleged violation of the Telecommunications Act of 1996—No Substantial Evidence for Denial; (ii) an alleged violation of the Telecommunications Act of 1996—Effective Prohibition; and (iii) an Appeal of Denial of Special Permit Pursuant to Massachusetts General Laws chapter 40A, § 17. The ZBA's decisions at issue are the ZBA 2005 decision, which pertains to the First Tower Site, and the ZBA's 2007 decision, which

pertains to the Second Tower Site. Industrial renews its argument that the "Board's refusal to approve Industrial's multiple zoning permit applications is a violation of the [Telecommunications Act] because it has the effect of prohibiting the provision of personal wireless services." Indus. Suppl. Mem. for S.J. at 1. According to Industrial, "[a]lthough the Board provided a purported list of reasons for denying the Second Special Permit Petition, it would be futile to analyze whether these criteria were being administered in a way that would be impossible for any applicant to meet because the Second Tower Site is no longer available (as of December 2007), and therefore any analysis would be moot. In any event, to the extent that the majority of reasons in the second denial are similar to those rendered for the First Tower site … Industrial reiterates the arguments set forth in Original Summary Judgment Memorandum." *Id.* at 16 n. 15. This Court must therefore analyze whether both denials constitute an effective wireless coverage prohibition in violation of the Telecommunications Act.

The 2006 hearing regarding the ZBA's 2005 Decision focused on whether Industrial had alternative sites and on whether Industrial could do something to adapt its proposed plan in a fashion acceptable to the ZBA. Thereafter, Industrial undertook further studies and came up with the Second Tower Site. The Second Tower Site proposed by Industrial and rejected by ZBA in 2007 is located in a residential area. As screening for the site, Industrial proposed to use six-foot trees and existing tree growth and vegetation. The proposed tower would be sited 133.8 feet from a residential property line. Given that By-law section 7.6.2.b.1.b requires that "[a]ll towers shall be located a minimum of 300 feet from the nearest residential property line," Industrial solicited a variance. The lot belongs to the Costa family, which had

signed a purchase and sale agreement with Industrial for the sale of the lot before Industrial requested the Town's permit. This purchase and sale agreement has since expired.

The ZBA found that Industrial's Second Tower site did not meet the requirements of By-law section 7.6.2.A, which indicates a preference for "the use of sites which comply with system design prerequisites for the location of new towers; and where visual and safety impacts are minimized, or can be mitigated." Section 7.6.2.A. It also found Industrial's proposal did not satisfy the specific requirement in section 7.6.2.b.1.b that "[a]ll towers shall be located a minimum of 300 feet from the nearest residential property line" nor the general requirements for issuance of special permits in By-law section 7.5.1.

Industrial argues that this denial, together with the 2005 Decision, constitutes an effective prohibition of provision of services forbidden by the Telecommunications Act.

The main issue before the Court remains whether Industrial has an alternative site on which to locate the tower. Industrial argues that it has performed exhaustive research and that the only possible alternative to the First Tower Site is the Second Tower Site which the ZBA has also denied. The ZBA argues that another lot—the Cordeiro lot—is a valid alternative site.

### A. Industrial's Argument that the ZBA's 2007 Denial is an Effective Prohibition of Wireless Communication Services.

■ The Telecommunications Act requires that "[t]he regulation of the placement, construction, and modification of personal wireless services facilities by any State or local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). To prove a violation of the "effective prohibition" provision Industrial must show that: (i) the Town's zoning decisions and ordinances prevent the closing of significant gaps in the availability of wireless services, *National Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 20, 25 (1st Cir.2002), and (ii) "further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Cellco P'ship v. Town of Grafton*, 336 F.Supp.2d 71, 82 (D.Mass. 2004) (Lindsay, J.).

### 1. The Closing of Significant Gaps.

Before the Court can find that the ZBA decisions prevent the closing of a coverage gap, it is necessary to establish whether there is a gap at all.

■ Industrial argues that a significant coverage gap exists for the PCS and cellular service providers in the northern region of Somerset along Route 138. Industrial has conducted tests in addition to the ones conducted in 2005 that confirm the existence of the gap. Industrial argues that the Board cannot dispute the existence of the coverage gap because it has not provided, on either of the two occasions when it considered Industrial's special permit applications, any evidence which contradicts the studies presented by Industrial. In its 2007 Decision, the Board relied on the testimony of seven neighbors to the Second Tower Site, clients of T–Mobile, who are of opinion that they have good cell-phone coverage.[4] These opinions

---

**4.** While the Board also pointed to a propagation study (submitted by Industrial with the Initial application) showing in the Board's words "relatively good coverage in the area of Route 138," it acknowledged evidence presented at the 2007 hearing that indicated "coverage gaps along Route 138." 2007 Decision at 5.

are not enough to call into question the studies presented by Industrial. *See Nextel Commc'ns of the Mid–Atlantic, Inc. v. Town of Sudbury,* No. 01–11754, 2003 WL 543383, at *11–12 (D.Mass. Feb. 26, 2003)(Woodlock, J.)(holding that subjective evidence like a Board member's test drive around town placing calls on a cell phone to determine coverage was not adequate rebuttal of the applicant's objective evidence). Industrial proved in 2005 that a coverage gap existed and in 2007 that such a gap continues to exist.

■ Having established the existence of a coverage gap, the next question is whether the ZBA's denials effectively prevented the closing of such a gap. The ZBA argues that it has not prevented the closing of the alleged gap because Industrial has alternative sites where it can place the tower. If a telecommunications provider argues "that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers." *Southwestern Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 63 (1st Cir.2001). Industrial argues that it has performed exhaustive research and that the Second Tower Site is the only available and viable alternative to the First Tower Site, rejected by the ZBA in 2005. Given that the Second Tower Site is no longer an alternative because the purchase and sale agreement has expired, it argues that there are no alternative sites to the First Tower Site where the tower could be placed.

### 2. Reasonable efforts are so likely to be fruitless that it is a waste of time to try.

Industrial argues that the fact that it has tried to get a permit for two and a half years and the fact that it has gone through the permit process not once but twice shows that the Board has a clear resistance to tower sites on available privately owned land in the Coverage Gap. This, it argues, constitutes a violation of the Telecommunications Act by effectively prohibiting the provision of personal wireless services. If, in fact, Industrial has other alternative sites to locate the facility, as the ZBA argues, then the fact that its application has twice been denied does not mean that the ZBA is prohibiting the wireless coverage, but simply that the places and plans Industrial proposed were not as suitable as other options it might have pursued.

Here again the issue comes down to whether Industrial has other alternatives.

### B. Alternative Sites

■ In order for a site to be an alternative sufficient to forestall a claim of effective prohibition, it needs to be available and technically feasible. *Nextel Commc'ns of Mid–Atlantic v. Town of Provincetown,* No. 02–11646, 2003 WL 21497159, at *11 (D.Mass. June 26, 2003) (Woodlock, J.).

Between August 2006 and May 2007 Industrial exhaustively investigated parcels of land in Somerset in search of an alternative to the First Tower Site. Industrial met with representatives of the Somerset Water Department to discuss the potential lease or purchase of certain lots owned by the Water Department. It expanded the original search area and examined 771 parcels of land to assess what additional sites might be suitable for placement of the tower. Most of the lots were either too small and thus did not meet the dimensional setback requirements; contained wetlands and thus were prohibited from containing a tower; were not available for sale; were within the Open Recreation zoning districts (which prohibit telecommunications towers); were within the Busi-

ness zoning district and not large enough to meet the height setback requirement; or were unavailable as town-owned conservation land not subject to development. Indus. Suppl. Mem. for S.J. at 5–6. Of the 771 parcels initially explored, only eight were preliminarily feasible. Of those eight lots, the owners of only one (the Second Tower Site) were interested in selling the site to Industrial. Although this site was not as good in covering the gap as the First Tower Site, Industrial signed a Purchase and Sale Agreement regarding the Second Tower Site with its owners, the Costa family.

Industrial argues that it has made a full effort to locate potential sites but that, other that the First or Second Tower Sites, there are no other potential sites which are feasible. It argues that, while the Coverage Gap continues to exist and people lack telecommunication coverage, further attempts to find a tower site would be a waste of time as an alternative site simply does not exist.

The ZBA counters that Industrial had alternatives to the First and Second Tower Sites. As to the First Tower Site, the ZBA argues that at least two lots were available, the Nunes parcel and the Cordeiro parcel. As to the Second Tower Site, the Board argues that Industrial had at least three alternative parcels, all owned by the Somerset Water Department, which are a) a triangular piece of land at the northeast corner of the Reservoir (the "Triangular lot"), b) a parcel containing the Water Department buildings (the "Buildings lot") and c) the Cordeiro lot. The Court will evaluate each of these lots separately.

### The Nunes parcel

This lot is one of the eight potential lots remaining of the 771 parcels evaluated. The Nunes lot, however, is not an alternative site because the owners are not interested in selling the land. The Nunes par-

cel is thus not an available alternative on which to place the telecommunications tower.

### The Triangular lot

This lot is owned by the Somerset Water Department and is not an alternative because it is part of a wetland area and thus has unstable soils that are unsuitable for erecting a telecommunications tower. The lot also contains underground pipes that would prevent the construction of the tower foundation. It does not have roadway access; Industrial would have to purchase a private right of way, which would require relocation of abutting property owners' lot lines and use of their properties. Moreover, this right of way would only be available during the construction phase since the Water Department has stated that it wants no permanent access to the Triangular lot and thus would require the removal of the access road once the tower is completed. Additionally, as is the case with all the other lots owned by the Water Department, this lot is not for sale nor has there been a request for proposal ("RFP") issued by the Town for the placing of a tower on the lot. Were an RFP to be issued, the lot would be subject to competitive bidding, which could result in another entity, other than Industrial, securing a lease for the site.

Accordingly, the Triangular lot is not an alternative site.

### The Buildings lot

There seems to be no space available within the Buildings lot on which to locate and construct a wireless telecommunications tower. This lot also contains wetland and underground pipes that prevent the construction of the foundation of the tower. As with the Triangular lot, no RFP has been issued.

Accordingly, the Building lot is not an alternative site.

*The Cordeiro lot*

The Cordeiro lot was suggested by the ZBA as a potential alternative site in both its 2005 and 2007 decisions. It too is owned by the Water Department of Somerset. According to Industrial, "[t]he Board's denial is, in effect, a directive that Industrial ... must construct a facility on the Town-owned Cordeiro lot if they want to build a telecommunications tower in Somerset that would remedy the Coverage gap." Indus. Suppl. Mem. for S.J. at 20. This is, according to it, an effective prohibition.

Industrial explored this lot and concluded that it was not a feasible alternative for several reasons. First, it found that some parts of this lot contained wetlands that precluded the construction of the tower. Industrial would need special permits for work in the one-hundred-foot buffer zone bordering vegetated wetlands and in the four-hundred-foot buffer zone surrounding the Somerset Reservoir. The ZBA disputes whether these wetlands exist at all. The Court need not resolve this issue because there are parts of the Cordeiro lot that are not wetlands and would be suitable for the construction of the tower.

Second, according to Industrial, the Cordeiro lot does not meet the dimensional requirements of the By-law, in that it does not meet the fifty percent height of tower and 300 foot residential property line minimum set back requirement of the Bylaw. "When the 300 foot setback requirement is applied from the northerly lot line[,] it forces the tower site south so far that the fifty percent height of tower setback of 87.5 feet cannot be met." Indus. Suppl. Mem. for S.J. at 12. One or more variances would be required. It is worth noting that the Second Tower Site had this

same problem—it violated the 300–foot property line buffer zone requirement—and the Board denied Industrial's variance application with respect to that site. One would think that the Board, which is pushing Industrial to construct the tower on the Cordeiro lot, would not deny such a variance application with respect to that lot. Although such a variance application probably would not be a problem in the Cordeiro lot, the position of the ZBA tends to demonstrate that denial of the Second Tower Site variance application was arbitrary.

Third, Industrial argues that the Cordeiro lot is not an alternative because the Water Department is unwilling to sell the property. Indus. Suppl. Mem. for S.J. at 12, 13. Industrial indicated to the Water Department that it wished to purchase a portion of the Cordeiro lot, including an upland area which contained a barn, as a possible tower location because it wanted ownership control over the site to avoid the limitations of a lease arrangement. The Water Department refused to sell the property and indicated that it would be willing to lease the property for an alleged statutory limit of ten years. This was not considered viable by Industrial which found that this short term lease would prevent it from recouping its initial capital investment.[5] The Court concludes from these arguments that a) there is a part of the Cordeiro lot that Industrial would consider viable and b) the problem with the 10–year lease is its duration. With respect to the latter, the ZBA has submitted the affidavit of Robert Lima, the Water Department superintendent. He consulted with the office of the Massachusetts Attorney General, which expressed its view that

---

5. Industrial's capital investment for a tower such as the one proposed would be approximately $400,000. Indus. Sup. Mem. for S.J. at 13. Industrial can expect to earn $1,500 to $2,000 per month from any one of the five major telecommunications carriers. The total amount of revenue per facility depends on how many carriers are located on the facility.

a municipality may lawfully lease real property for more than ten years. *See* Lima's Suppl. Affidavit [Doc. No. 43 at 3]. Were the Water Department to agree to a longer lease, the problem of recouping the investment would be resolved. Industrial, however, sees further problems with the Cordeiro lot.

The Cordeiro lot abuts a residential neighborhood and a public school. A telecommunications tower may visually impact the neighborhood. This residential neighborhood, High Ridge Estates, is the neighborhood that opposed the construction of the tower at the First Tower Site. The First Tower Site, the Second Tower Site, and the Cordeiro lot are all located within a similar distance from this neighborhood. Since the Cordeiro lot is "sandwiched" between the First and Second Tower Sites, the opposition of the neighbors is to be expected in the case of the Cordeiro lot as well, although the ZBA has suggested (without any support) that the visual impacts will be less in the Cordeiro lot than in the First Tower Site. *See* 2007 Decision at 10.

Furthermore, the Cordeiro lot not only provides inferior coverage as compared to the First Tower Site, but also, such as with the Triangular and Building lots, has never been the subject of a RFP making this site available for sale. The coverage issue is not an impediment because, although the Cordeiro lot is not as good as the First Tower Site, it is adequate. This is why Industrial considered buying part of that lot. Although Lima states that the "Board of Water and Sewer Commissioners ... have indicated that they would be willing to go to Town Meeting for any needed approvals and issue a Request for Proposals," Lima's Suppl. Affidavit at 2, the issuance of the RFP could be problematic because of the time delay and the lack of any assurance that the ZBA would ultimately grant a permit to Industrial.

## IV. CONCLUSION

The great strength of the Telecommunications Act of 1996 lies in its balanced sensitivity to accommodating the national policy of providing wireless services to all Americans with the equally important policy favoring local control by locally elected officials over local zoning matters.

Here, there is a Coverage Gap in Somerset. Accordingly, Industrial will be permitted to construct a wireless communications tower within the Town. Just where that tower will be located, however, is largely, but not entirely, up to the ZBA. Should the ZBA continue to prefer the Cordeiro lot, Industrial is directed to use its best efforts to buy or lease that lot for a sufficiently long term to make such lease economically worth while. Should this course be adopted, the ZBA is directed to grant such set-back variances as will make the project viable. As neither the Town nor the Water Department is a party to this suit, they are not subject to this judgment in any way. If, however, after using its best efforts, Industrial has not secured the necessary permits and related interests in the land for the Cordeiro site within six months of the date of this memorandum and order, it may proceed to erect its tower on the First Tower Site and the ZBA shall grant such set-back variances as will enable the project at this site.

The Court will retain jurisdiction to ensure compliance with its orders.

SO ORDERED.