**NEW YORK SMSA LIMITED PART-NERSHIP d/b/a Verizon Wireless, Plaintiff,**

v.

**VILLAGE OF FLORAL PARK BOARD OF TRUSTEES and the Village of Floral Park Village Clerk, Defendants.**

**No. 09–CV–2385 (ADS) (ARL).**

United States District Court,
E.D. New York.

Sept. 19, 2011.

---

Amato Law Group, PLLC, by: Alfred L. Amato, Esq., Richard S. Keenan, Esq., Megan F. Carroll, Esq., Of Counsel, Garden City, NY, for Plaintiff.

Ryan Brennan & Donnelly, LLP, by: John E. Ryan, Esq., Of Counsel, Floral Park, NY, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In this case, the plaintiff New York SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon") alleges that the Village of Floral Park ("the Village") Board of Trustees ("the Board") and the Village of Floral Park Village Clerk denied its request for a special use permit to construct a public utility wireless telecommunication facility, in violation of the Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. § 332(c) and Article 78 of the New York Civil Procedure Law and Rules. Presently before the Court are Verizon's motion for summary judgment and the Board's cross-motion for summary judgment. For the reasons set forth below, the Court grants Verizon's motion for sum-

mary judgment and denies the Board's cross-motion for summary judgment.

## I. BACKGROUND

Unless otherwise indicated, the following constitutes the undisputed facts of the case derived from the administrative record in this case ("the record") and the parties submissions, accompanying affidavits and Rule 56.1 Statements.

### A. The Parties

Verizon is a "telecommunications carrier" that is considered a public utility for zoning purposes. *See Cellular Tel. Co. v. Rosenberg,* 82 N.Y.2d 364, 371–72, 604 N.Y.S.2d 895, 624 N.E.2d 990 (1993). The Federal Communications Commission ("FCC") has issued to Verizon two licenses in order to operate on two separate frequencies: (1) the 850 megahertz cellular bandwidth ("Cellular") and (2) the 1900 megahertz PCS bandwidth ("PCS"). Pursuant to these licenses, Verizon provides wireless service on both bandwidths, which are not coextensive, throughout New York, including but not limited to areas within the Village.

The defendant Village of Floral Park Board of Trustees responsibilities include, among other tasks, the review of special use permit applications submitted in connection with the construction of wireless communication facilities. The defendant Village Clerk is responsible for maintaining the Village's official records and documents.

### B. Verizon's Network

As Verizon explains, to provide wireless service, Verizon uses a method of radio communication known as "mobile telephony", whereby mobile wireless devices communicate with "cell sites" (also referred to as "telecommunication facilities") by sending and receiving signals and in turn, each cell site connects the mobile device to a landline telephone network. In order to provide seamless and reliable coverage to its customers, Verizon must create a network of cell sites with overlapping coverage because as a customer moves away from a cell site, the coverage from that cell site becomes weaker, and the call with only be transferred to the adjacent cell site if and when the signal level of the adjacent site becomes sufficiently strong. The cell sites must also be placed at particular locations and heights because the radio signals are weakened by obstructions, such as terrain, foliage, and buildings.

With respect to the interplay between the two types of bandwidth, the primary difference between Cellular and PCS is that PCS operates at more than twice the frequency and therefore exceeds the capacity of Cellular. However, a PCS signal does not extend as far as a Cellular signal, and is more susceptible to being weakened by trees, buildings, and terrain effect. (R. 125.) According to Verizon, when the Cellular bandwidth reaches capacity, existing calls are transferred to the PCS bandwidth. Thus, customers utilizing the PCS bandwidth may drop or lose calls upon entering an area that is experiencing a PCS service deficiency.

### C. Verizon's Application

Verizon purports to have identified a coverage gap in their PCS service, which encompasses the Village as well as parts of the neighboring Incorporated Village of Stewart Manor ("Village of Stewart Manor"), New Hyde Park, Elmont and Franklin Square. An area is experiencing a "coverage gap" when the network is unable to "adequately and reliably transmit and/or receive telephone calls and/or data transmissions". (Rule 56.1 Stmt. ¶ 48.) The coverage gap measures approximately 1.2 miles north to south of the Property,

and approximately .6 miles from east to west of the Property ("the Floral Park search area").

In order to close the coverage gap, Verizon sought to construct a wireless telecommunications facility that would consist of three sectors of wireless panel antennas (with two antennas per sector) for a total of six antennas (the "Antennas") and related communication equipment (the "Communication Equipment" and together with the Antennas the "Facility" or "Rooftop Facility").

On October 14, 2008, Verizon submitted an application (the "Application") with the Board for a special use permit (also referred to as a "variance", "area variance", or "conditional use permit") allowing the installation of the Facility on the roof of a commercial building (the "Building") located at 85–87 Covert Avenue, within the Village B–1 Restricted Business Zoning District, Floral Park, Nassau County, New York (the "Property"). The Building is a two story commercial building owned by Fox & Company, which is occupied by a salon spa and a dentist's office. The area surrounding the Property is a commercial corridor, consisting predominantly of low one-story commercial buildings flanked by residential developments, and is located on the eastern boundary of the Village and the Village of Stewart Manor. The following facts about the proposed Facility are undisputed:

- The Communication Equipment and the Antennas will be installed on the central portion of the roof and will be concealed within an approximately 10′–7″ × 22′–7″ sound attenuated screening enclosure (the "Stealth Enclosure") painted to match the Building. (R. 249; 239–240; Site Plans).
- The top height of the Stealth Enclosure will be approximately 31′–10″ from the ground, or approximately 7′–

10″ above the existing roof. (R. 249; 239–240; Site Plans).

- The Rooftop Facility will be entirely screened from view by the Stealth Enclosure, which will look almost identical to the Building and will resemble an extension of the Building.

(Pl.'s Rule 56.1 Stmt. ¶¶ 69–71.)

The Village regulates the approval of wireless telecommunication facilities within its borders through the Village of Floral Park Town Code (the "Code"). The Code provides guidelines for the construction of telecommunications facilities, including wireless communications towers and antennas. Verizon's Application proposed to construct the Facility on an "antenna support structure", which is defined in the Code as "[a]ny building or structure other than a tower which can be used for location of telecommunications facilities." Code § 99–28.3. The applicable guidelines for building an antenna support structure are distinct from those for constructing a "tower", which is defined as "[a] self-supporting lattice or monopole structure constructed from grade which supports telecommunications facilities." *Id.* The guidelines for constructing a telecommunications facility on an antenna support structure require that the antenna support structure be at least .50 feet tall, and prescribe specific antenna height requirements and setback requirements. *See* Code § 99.28.17 (the "General Antenna Support Structure Requirements").

The parties do not dispute that Verizon's Application satisfied the antenna height requirement and the set back requirement in § 99.28.17. However, because the Property was less than 50 feet tall, Verizon was required to seek a special use permit to allow for a height modification. In order obtain a special use permit for a height modification to the General Antenna Sup-

port Structure Requirements, the Code requires the application to show:

> that the modification is necessary to: [1] facilitate collocation of telecommunications facilities in order to avoid construction of a new tower; [2] to meet the coverage requirements of the applicants wireless communications systems, which requirements must be documented with written technical evidence from an engineer that demonstrates that the height of the proposed tower is the minimum height required to function satisfactorily, and [3] no tower that is taller than such minimum height shall be approved.

Code § 99.28.21(B)(4) ("Height Modification Requirements").

Prior to assessing Verizon's Application, the Board performed a required environmental assessment of the project. On October 21, 2008, the Board issued a Negative Declaration and Notice of Determination of Non–Significance Pursuant to the State Environmental Quality Review Act ("SEQRA declaration"). By giving the Application a negative SEQRA declaration, the Board concluded that the proposed Facility would not have a significant effect on the environment. (R. 429–30.)

### D. The Hearing on Verizon's Special Use Permit Application

On March 3, 2009, the Board held a public hearing on the Application. At the hearing, Verizon presented the live testimony of eight expert witnesses and thirteen sworn affidavits, technical reports and exhibits. Following the hearing Verizon submitted two additional affidavits, and a letter from one of the experts. As summarized by Verizon, it presented the following experts who testified in support of the Application:

- Daniel Falasco of Savick & Murray, Consulting Engineers, a civil engineer, testified as to proposed build of the Rooftop Facility, and prepared an Engineering Report demonstrating that the proposed installation would be structurally sound, and comply with all applicable building codes.
- John Hauenstein of JRH Acoustical, an acoustical engineer, testified as to the noise level of Rooftop Facility and prepared an Acoustical Study, as well as a letter dated March 20, 2009 demonstrating that the Rooftop Facility would be in compliance with the Village noise ordinance.
- Erin Duffy Echevarria of VHB Engineering, Surveying and Landscape Architecture, P.C., testified as to the planning, environmental and visual issues with regard to the design and location of the Rooftop Facility, and prepared a Planning, Zoning and Visual Impact Analysis and Report concluding that the Rooftop Facility "[w]ould not result in substantial changes to the physical characteristics of the area or significant adverse impacts to neighborhood character or environmental conditions," and would have a de minimis aesthetic impact on the surrounding community because there would be no significant impact to the character or aesthetics of the surrounding neighborhood or to the environmental conditions on the Property. (R. 244–304; 72–87).
- John Breslin, a real estate appraiser, testified that the Rooftop Facility would not have a negative impact on the values of the nearby homes, and prepared an Appraisal Report demonstrating that the installation of the Rooftop Facility would not impair the value of the surrounding properties. (R. 357–374; 87–92).
- Louis Cornacchia of Scinetics Corporation, a radio frequency ("RF") emis-

sions health expert, testified that the RF emissions from the proposed Rooftop Facility will be well below the FCC regulations for RF emissions, and prepared a Health Report that confirmed and corroborated his testimony. (R. 327–356; 93–97; 199–201).

- John Gomez, a site acquisition consultant for Verizon Wireless, testified about the "site selection process" as well as the potential alternative locations for the Rooftop Facility that were investigated by Verizon Wireless, and prepared an affidavit regarding his investigation of alternative sites confirming that the other potential sites were either rejected from an RF perspective or unavailable from a leasing perspective. (R. 98–109).

- Anthony Wells of C–Squared Systems, Inc., an RF engineer ("RF Engineer"), explained Verizon Wireless' coverage need (i.e., the PCS deficiency) and that the Rooftop Facility would eliminate the PCS deficiency. (R. 110–155). . . . Mr. Wells prepared affidavits with attached Propagation Maps and Drive Test data . . . as well as an affidavit regarding investigation of alternative sites. . . .

- Vishwa Mithu, an RF engineer with Verizon Wireless, testified as to Verizon Wireless' RF need for the Rooftop Facility, and prepared an affidavit (the "Mithu Affidavit") confirming that the other Verizon Wireless facility in the Village (the "Silo Site" approximately 1 mile from the Property) was designed to remedy a cellular service deficiency that Verizon Wireless was experiencing, based upon Verizon Wireless' needs and customers' demands at that time.

(Pl.'s Rule 56.1 Stmt. ¶¶ 29–37.)

In opposition to the Application, the Village did not retain any experts to oppose or review the application. Fifteen residents of the Village submitted letters in opposition and ten residents testified at the hearing opposing the Application based on perceived negative impacts on the environment, health, aesthetics of the town, noise levels, and property values.

One concern expressed by members of the Board throughout the hearing focused on a previous application by Verizon in 2005 ("the Silo Site application"), which the Board granted on May 16, 2006, for a special use permit to install six wireless communication antennas, an equipment room, generator, and related appurtenances on a pre-existing silo located at 22 Van Buren Avenue, Floral Park, New York (the "Silo Site"). The Board granted the Silo Site application in part based upon the testimony of Vishwa Mithu, who submitted an affidavit stating that "the [Silo Site] is the best suited location to provide seamless reliable coverage to a substantial portion of the Floral Park search area". (R. 6 (quoting from the Affidavit of Vishwu Mithu, sworn to November 18, 2005, at ¶ 23).) The Board questioned how Verizon could "reconcile" its representation during the application process for the Silo Site that the Silo Site would eliminate the coverage gap in the Village, and the evidence presented for the Facility that a coverage deficiency existed.

In addition, members of the Board questioned the accuracy of the coverage deficiency data by citing the lack of statistical analysis showing dropped or missed calls, and through anecdotes about their own personal experiences with adequate Verizon cellular service. Finally, the Board questioned Verizon about its evaluation of alternative sites, including: (1) why it had not sought to construct the Facility on a municipal Water Tank located in New Hyde Park that would cure the portion of the coverage gap within the Village; and

(2) whether it had considered as a possible alternative site a one-story garage owned by Verizon that is located .25 miles from Property on Covert Avenue.

### E. The Decision and the Instant Action

In a written decision dated May 5, 2009 and filed May 6, 2009, the Board denied the Application (the "Denial") based on the following conclusions:

a) that the subject property does not conform to the Zoning Code inasmuch as it measures only twenty-four (24') feet in height and, further, that with the exception of the silo site, there are no telecommunications facilities situated on any building in the Village

b) Verizon did not establish any entitlement to relief under the Zoning Code § 99–28.21.B(4) insomuch as the proposed modification neither facilitates collocation of telecommunication facilities nor otherwise meets Verizon's coverage requirements in the Village;

c) Verizon's coverage maps confirm adequate coverage exists within the Village;

d) Verizon failed to demonstrate why it should not be required to collocate its facilities on the nearby municipal water tower which, according to Verizon's coverage maps, would eliminate any coverage problems in the Village; and

e) Verizon failed to demonstrate diligent examination of alternative sites, including its own building located on Covert Avenue approximately one-quarter of a mile north of the subject premises.

(R.10.)

On June 6, 2009, Verizon filed the instant complaint against the Board and the Clerk, asserting that the Denial was not supported by substantial evidence in violation of the Telecommunications Act of 1996, 47 U.S.C. § 332(c) and was both not supported by substantial evidence and arbitrary and capricious in violation of Article 78 of the New York Civil Procedure Law and Rules. Verizon now moves for summary judgment on all three causes of action. The Board cross-moves for summary judgment on the same claims.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Globecon Group, LLC v. Hartford Fire Ins. Co., 434 F.3d 165, 170 (2d Cir. 2006). In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir.1989)).

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party to present "specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e). The nonmoving party may not then rely solely on "conclusory allegations or unsubstantiated

speculation" in order to defeat a motion for summary judgment. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). If the evidence favoring the nonmoving party is "merely colorable ... or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (internal citations omitted).

## B. Standard of Review for a Substantial Evidence Claim under the Telecommunications Act

The Telecommunications Act of 1996 ("TCA") is "an omnibus overhaul of the federal regulation of communications companies," the purpose of which is to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services ... by opening all telecommunications markets to competition...." *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 637 (2d Cir.1999) (quoting H.R. Conf. Rep. No. 104–458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 124). "One of the means by which [Congress] sought to accomplish these goals was reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications, such as antenna towers." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 115, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005). Thus, Congress amended the TCA to include section 332(c)(7), which "preserved the authority of state and local governments over zoning and land use issues, but imposed limitations on that authority." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 101 (2d Cir.2010) (citing 47 U.S.C. § 332(c)(7)).

■ Pursuant to section 332(c)(7), local governments retain authority over "decisions regarding the placement, construction, and modification of personal wireless service facilities", § 332(c)(7)(A), but may not "unreasonably discriminate among providers of functionally equivalent services," § 332(c)(7)(B)(i)(I), take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II), or deny a request "on the basis of the environmental effects of radio frequency emissions," § 332(c)(7)(B)(iv). Most relevant to the instant case is the requirement in section 332(c)(7)(B)(iii) that:

> [a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record

47 U.S.C. § 332(c)(7)(B)(iii). To determine whether a denial was supported by substantial evidence, courts "must employ 'the traditional standard used for judicial review of agency actions.'" *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir.1999) (quoting H.R. Conf. No. 104–458, at 208 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 223). Substantial evidence requires "less than a preponderance, but more than a scintilla of evidence [and] 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Universal Camera v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ When evaluating whether a denial was supported by substantial evidence, "local and state zoning laws govern the weight to be given the evidence." *Id.* Thus, while the TCA governs the "procedural requirements that local boards must comply with in evaluating cell site applica-

tions" the applicable substantive standards are the "established principles of state and local law". *Id.* (citation and internal quotation marks omitted). In reviewing a zoning board's decision, the Court must view the record in its entirety, including evidence opposed to the Board's view, and "may neither engage in [its] own fact-finding nor supplant the Town Board's reasonable determinations." *Town of Oyster Bay,* 166 F.3d at 494. However, a zoning boards denial of an area variance based on a consideration that is not included in a local or state zoning law cannot be supported by substantial evidence. *T–Mobile Cent. LLC v. City of Fraser,* 675 F.Supp.2d 721, 738 (E.D.Mich.2009) (noting that in the Sixth Circuit, grounds for denial of a variance "are not based on substantial evidence if they do not relate to any of the criteria set out in the zoning ordinance" and therefore "[i]n the absence of a correlation between the Board's stated reasons and some provision of the ordinance which it invokes as grounds for its action, a finding of substantial evidence is not warranted") (citing *New Par v. City of Saginaw,* 301 F.3d 390, 398 (6th Cir.2002)); *Verizon Wireless (VAW) LLC v. Douglas County, Kan. Bd. of County Comm'rs,* 544 F.Supp.2d 1218, 1245 (D.Kan.2008) (holding that a denial is not supported by substantial evidence if it "imposes a burden upon [the wireless provider] to prove facts for which there is no requirement under state or local law").

▪ Here, the applicable local law is the Code, which sets forth the requirements for obtaining a special use permit to construct a telecommunications facility. With respect to the applicable state law, because in New York wireless providers such as Verizon are afforded the status of public utilities for the purposes of zoning applications, *see Cellular Tel. Co. v. Rosenberg,* 82 N.Y.2d 364, 604 N.Y.S.2d 895, 624

N.E.2d 990 (1993), their applications are reviewed under the "public necessity" standard established in *Consolidated Edison Co. v. Hoffman,* 43 N.Y.2d 598, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978). This standard provides that "[r]ather than granting a variance only on a showing of 'unnecessary hardship,' a local zoning board must consider whether the public utility has shown 'a need for its facilities' and whether the needs of the broader public would be served by granting the variance." *Town of Oyster Bay,* 166 F.3d at 494 (quoting *Consolidated Edison,* 43 N.Y.2d at 608–10, 403 N.Y.S.2d 193, 374 N.E.2d 105). This has been interpreted in the context of zoning decisions for telecommunications facilities to require that "[a] telecommunications provider that is seeking a variance for a proposed facility need only establish [1] that there are gaps in service, [2] that the location of the proposed facility will remedy those gaps and [3] that the facility presents a minimal intrusion on the community". *Site Acquisitions, Inc. v. Town of New Scotland,* 2 A.D.3d 1135, 770 N.Y.S.2d 157 (3d Dep't 2003); *see also Omnipoint Commc'ns, Inc. v. City of White Plains,* 430 F.3d 529, 535 (2d Cir.2005).

▪ If the public utility makes the required showing, which necessarily means the record is devoid of substantial evidence to support a denial, the variance must issue. *Omnipoint Commc'ns, Inc. v. Town of LaGrange,* 658 F.Supp.2d 539, 555 (S.D.N.Y.2009). On the other hand, "[i]f the Court finds that even one reason given for the denial is supported by substantial evidence, the decision of the local zoning body cannot be disturbed." *New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals,* No. 08–CV–4833, 2010 WL 3937277, at *4 (E.D.N.Y. Sept. 30, 2010).

As set forth below, the Court finds that the Board's denial disregarded most of

Verizon's uncontroverted evidence that the Facility satisfied the requirements in the Code and the state law public necessity standard of showing a coverage gap, that the Facility would remedy the coverage gap, and that the Facility would have a negligible impact on the community. Instead, the Board primarily based its rejection of the Application on Verizon's failure to satisfy requirements that were not based in any applicable state or local law. Accordingly, the Court finds that each of the Board's proffered reasons for denying the Application are not supported by substantial evidence and therefore in violation of the TCA.

### C. General Antenna Support Structure Requirements under § 99.28.17

Section 99.28.17 of the Code prohibits building a telecommunications facility on an antenna support structure that is less than 50 feet in height. It is undisputed that the Building was only 24 feet high, which is why Verizon sought a special use permit for a height modification pursuant to § 99.28.21. The Board contends that, even if Verizon met all of the requirements under § 99.28.21 for a height modification, they were still authorized to deny the Application because: (1) granting a height modification is entirely within their discretion and (2) the proposed modification was "substantial". The Court disagrees.

 First, the contention that a zoning board has the authority to reject an special use permit by a wireless provider regardless of whether it meets the requisite criteria is antithetical to the TCA's requirement that all denials be supported by "substantial evidence". Indeed, because local and state zoning laws govern the weight to be given the evidence, "[a] local zoning commission, which acts in an administrative capacity when considering an application for a special permit, does not

have discretion to deny the permit if the proposal meets the relevant standards enumerated in the regulations." *SBA Commc'ns, Inc. v. Zoning Comm'n of Town of Brookfield,* 112 F.Supp.2d 233, 237 (D.Conn.2000). The Board's reliance on this Court's decision in *Sprint Spectrum L.P. v. Board of Zoning Appeals of the Town of Brookhaven,* 244 F.Supp.2d 108 (E.D.N.Y.2003) to support its argument that it does not have to justify the denial of a special use permit is misplaced.

In *Brookhaven,* the defendant zoning board had discretion under the town code to reduce the setback requirement from 150% to 75% if "the goals of the local law would be better served thereby". 244 F.Supp.2d at 116 (quoting Brookhaven Town Code § 85–457(B)(4)(c)). The court found that, because the proposed monopole "would ... be within six feet of customer parking and within approximately thirty-one feet of an office complex building", and therefore was a "potential hazard to the public", the defendant board "had substantial evidence to deny the application on the basis of the failure to comply with the setback requirements". *Id.* at 116–117. Thus, the defendant board was still required to proffer a reason for the denial, even under a town code that provided considerably more discretion for denying a special use permit than the Code in the instant case. *See also SiteTech Group Ltd. v. The Bd. of Zoning Appeals of the Town of Brookhaven,* 140 F.Supp.2d 255, 263 (E.D.N.Y.2001) (holding the town board's denial on the grounds that the plaintiff provider failed to meet the setback requirement was supported by substantial evidence not because the town board had the discretion to deny the modification, but because the plaintiff had not met the stated requirements for the modification).

■ Here, the Code sets forth specific criteria that a wireless provider must meet to obtain the modification. Accordingly, "[a]lthough the board retains some discretion to evaluate each application, to determine whether applicable criteria have been met, and to make common sense judgments as to whether the application should be granted, such determination must be supported by substantial evidence". *Omnipoint Commc'ns v. Town of LaGrange,* 658 F.Supp.2d 539, 558 (S.D.N.Y.2009) (citing *Twin County Recycling Corp. v. Yevoli,* 90 N.Y.2d 1000, 1002, 665 N.Y.S.2d 627, 628, 688 N.E.2d 501 (1997)).

■ Furthermore, the Board's contention that the proposed modification was "substantial" and therefore a valid ground for denying the application is not only a post-hoc rationale offered for the first time in litigation, but is also not grounded in any applicable state or local zoning law and therefore is not supported by substantial evidence. Moreover, as set forth below, even if the modification was substantial, it still would not be a valid basis for denying the Application because the record reflects that Verizon met its burden in showing that the proposed Facility would not have "an undesirable effect on the character of the neighborhood, adversely impact on physical and environmental conditions, or otherwise result in a detriment to the health, safety, and welfare of the neighborhood or community." *Beyond Builders, Inc. v. Pigott,* 20 A.D.3d 474, 475, 799 N.Y.S.2d 241, 242 (2d Dep't 2005).

### D. Characteristics of the Village

■ In denying the Application, the Board stated that "with the exception of the silo site, there are no telecommunications facilities situated on any building in the Village" and therefore the proposed use is not in keeping with the overall characteristics of the Village. As an initial

matter, the Board's argument that the Facility is not in keeping with the overall characteristics of the Village because it is located on property other than the Silo Site, is not embodied in the Code. It is also very likely a violation of the TCA insofar as it would be the effective equivalent of a ban on the construction of any future telecommunication facilities that could not collocate on the Silo Site. Furthermore, the Court finds that there is no evidence in the record, let alone substantial evidence, to support a finding that the Facility would interfere with the overall characteristics of the Village.

At the hearing, Verizon submitted the expert testimony and technical reports from: (1) a civil engineer demonstrating that the Facility would be structurally sound and in compliance with all applicable building codes; (2) an acoustical engineer who performed an acoustical study that showed that the Facility would not generate any noise that would exceed the requirements of the Code; (3) an expert from an engineering, surveying, and landscape architecture firm who prepared eight photo simulations and report concluding that the Facility "[w]ould not result in substantial changes to the physical characteristics of the area or significant adverse impacts to neighborhood character or environmental conditions" and that the Facility would have a de minimis aesthetic impact on the surrounding community because there would be no significant impact to the character or aesthetics of the surrounding neighborhood or to the environmental conditions on the Property (R. 244–304); (4) a real estate appraiser who testified and prepared a report concluding that the Facility would not have a negative impact on the property values in the surrounding area; and (5) an RF emissions expert who testified and prepared a report concluding that the RF emissions from the

Facility will be well below the FCC regulations for RF emissions.

▮▮▮ The only evidence in opposition was generalized objections from residents of the Village about the negative impact on the environment and their health, the aesthetics of the town, and property values. The general aesthetic objections were not directed at the actual proposed Facility, but rather about how the Facility would set a precedent that could lead to the construction of future telecommunications facilities that would collectively have a negative aesthetic impact on the Village. Such objections are not a basis for denial insofar as a "few generalized expressions of concern" about aesthetics by residents that are grounded in speculation about future facilities as opposed to direct critiques of the actual proposal "cannot serve as substantial evidence on which the [Village] could base the denials." *Town of Oyster Bay*, 166 F.3d at 496. In addition, although a few residents raised concerns about property values, these were simply conclusory assertions that property values would decrease, which do not amount to substantial evidence. *See Sprint Spectrum L.P. v. Board of Zoning Appeals of Town of Brookhaven*, 244 F.Supp.2d 108, 115–16 (E.D.N.Y.2003) (Spatt, J.).

▮▮ The majority of the concerns raised were about the negative impact of electromagnetic waves from the Antennas on health and the environment. As an initial matter, by granting Verizon a negative SEQRA Declaration, the Board had already determined that there was no negative impact on the health, safety and welfare of the neighborhood or community. Moreover, the TCA expressly prohibits a local zoning board from denying an application that is otherwise compliant with FCC emissions regulations "on the basis of the environmental effects of radio frequen-

cy emissions". 47 U.S.C. § 332(c)(7)(B)(iv). Here, the uncontroverted evidence in the record is that the Facility would be in compliance with FCC emissions regulations. Thus, "[t]he unsubstantiated concerns of the general public—especially on a matter that has been expressly preempted by federal law—do not constitute 'substantial evidence.'" *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F.Supp.2d 539, 558 (S.D.N.Y. 2009); *see also MetroPCS New York, LLC v. Village of East Hills*, 764 F.Supp.2d 441, 456 (E.D.N.Y.2011) (holding that because MetroPCS "provided uncontroverted evidence that the radio frequency emissions of the proposed antennas and the existing antennas comply with the FCC regulations" the zoning board could "not rely upon testimony and evidence presented at the hearings concerning the possible health and safety effects of the radio emissions").

Viewing the record in its entirety, the Court finds that the Board's denial on the grounds that the Facility is "not in keeping with the overall characteristics of the Village", which ignored the expert testimony, technical reports, and data concluding that the Facility would blend in with and not negatively impact the property values of the surrounding neighborhood and comply with applicable noise level and radio emissions requirements, and which relied solely on generalized objections and the fact that there is only one other existing telecommunications facility in the Village, is not supported by substantial evidence. *See Gonzalez v. Zoning Bd. of Appeals of Town of Putnam Valley*, 3 A.D.3d 496, 497–98, 771 N.Y.S.2d 142, 144 (2d Dep't 2004) (holding that "[t]he generalized and unsubstantiated concerns of neighboring owners, upon which the Zoning Board based its determination, that the character of the neighborhood would be detrimental-

ly changed if the petitioner's application for variances was granted, were unsupported by any empirical data or expert testimony and were insufficient to counter the evidence presented by the petitioner").

### E. Height Modification Requirements under § 99.28.21(B)(4)

The Board's second stated reason for denying the Application was that Verizon had failed to meet two out of the three criteria for obtaining a special use permit to construct the Facility on an antenna support structure that was less than 50 feet tall. In particular, the Board asserts that: (1) the proposed Facility would not facilitate collocation and (2) Verizon has not established the existence of a coverage gap. As set forth below, the Court finds that these grounds for denial were not supported by substantial evidence.

#### 1. Collocation

■ The first requirement for obtaining a height modification under the Code is establishing that the proposed facility will "facilitate collocation of telecommunications facilities in order to avoid construction of a new tower." Code § 99.28.21(B)(4). The parties do not dispute that the only existing telecommunications facility in the Village is the Silo Site, and that Verizon has antennas on the Silo Site that transmit on the Cellular bandwidth. Verizon submitted expert testimony explaining why it could not collocate on the Silo Site. As previously stated, Verizon holds separate FCC licenses to operate on two separate but coextensive frequencies, Cellular and PCS. The proposed facility would extend Verizon's coverage over the PCS bandwidth, through which Verizon provides both voice and data services, including electronic mail, virtual private network access, web browsing and text messaging. At the hearing, Anthony Wells, an RF engineer, testified that Verizon could not place the antennas on the Silo Site because the service deficiency was with the PCS signal, and although the PCS bandwidth exceeds the capacity of the Cellular bandwidth, it does not cover an area as far as the Cellular bandwidth. As a result, placing an antenna broadcasting on the PCS bandwidth in the same location as Silo Site would not close the coverage gap. Furthermore, Verizon presented expert evidence that the only way to avoid seeking modification would be to build a new support structure at least 50 feet high or to build a new tower. Thus, granting the Application would avoid the construction of a tower.

Although the Board cites as a reason for denial that the Facility would not facilitate collocation of telecommunications facilities, the grounds for this argument appear to be based entirely on the contention that the Silo Site provides adequate coverage for the Village. As discussed below, the Court finds that the record sufficiently demonstrates the existence of a coverage deficiency that the Silo Site cannot remedy, and the Court finds that the Board's denial on the grounds that the Facility would not facilitate collocation or avoid the construction of a new tower is not supported by substantial evidence.

#### 2. Coverage Gap

The Code provides that, in order to obtain a variance for height modification, the applicant must show "that the modification is necessary ... to meet the coverage requirements of the applicant's wireless communications system." Code § 99–28.21(B)(4). According to the Board, Verizon did not satisfy this requirement because: (1) Verizon did not meet its burden of showing the existence of a coverage gap and (2) to the extent a coverage gap exists, because it is predominantly located outside

of the Village, either the Village has adequate service or not enough residents of the Village will benefit from the Facility to warrant approval of the Application.

### a. Evidence of a Coverage Gap in the Floral Park Search Area

At the hearing, Verizon presented the expert testimony of two RF engineers, Anthony Wells and Vishwa Mithu, as well as technical reports and data in order to demonstrate the existence of a coverage gap in the Floral Park search area. The relevant evidence is summarized below.

Wells testified that he used a computer modeling system to locate the coverage gap and to generate propagation maps showing the areas of service deficiency. According to Wells, the factors that go into propagation modeling to determine the existence of a service deficiency include, among other factors, information from surrounding preexisting sites about: the antenna type and height; the type of cable loss from a transmitter to the antenna which calculates the effected radiated power; where the instruments are pointed; how much power is out of the bay station; and how weak the signal is from the bay station. In addition, the computer model divides an area into 30 by 30 meters "bins" to account for terrain and land use because, for example, with land use "the signal propagates much differently than . . . over the water versus trying to get through trees and buildings". (R. 140–41.)

Wells submitted in the record propagation maps showing the results of the computer model. Based on the results of the propagation modeling Wells concluded that: "(i) there exists a serious deficiency in Verizon Wireless' communications coverage within the Floral Park search area; (ii) the Site is the best suited available location, with the minimum antenna height required in order to provide seamless reliable coverage within the Floral Park

search area; and (iii) the effectiveness of the Site is confirmed by computer modeling." (R. 316.)

In addition to the computer modeling, Wells also testified that he performed two separate "drive tests" to confirm the results of the model that a service deficiency existed in the vicinity of the Property. In an affidavit submitted after the hearing, Wells explained that he obtained the drive test measurements in the following manner:

[A] laptop computer utilizing sophisticated software is connected to a mobile test phone with a Global Positioning Satellite ("GPS") located and fitted within an automobile (collectively, the "Testing Equipment"). A predefined route is then driven that adequately characterizes the network performance in the subject area. During the route, the Test Equipment measures call performance of the current Verizon Wireless voice and data network to capture both signal strength and quality metrics. GPS navigation data is also collected in parallel to associate measurement points with position data. The results of the drive test can then be plotted on a road map to illustrate the insufficient or problem areas in the network.

(R. 15.) Wells attached a Drive Test Map to his supplemental affidavit, which he concluded "demonstrates that there is not uniform and reliable wireless coverage near the proposed site." (*Id.*)

The Board asked Wells to reconcile his findings with Verizon's representation in conjunction with the Silo Site application that the Silo Site would remedy the existing coverage problems in the Village. In response, he stated that the existing coverage gap can be attributed to an increase in demand that occurred after the approval of the Silo Site application and the advance-

ments in technology that expanded the use of data services. Wells also stated that the increased demand for wireless communication and data services "surprised a lot of people in the industry, even the experts" and that, as a result of this increased demand, Verizon bought the PCS license because they ran out of capacity on the Cellular bandwidth. (R. 129.)

With respect to the Board's concern about the lack of data reflecting dropped or missed calls, Wells testified that, as opposed to computer modeling and drive tests which provide accurate data of a service deficiency, it is difficult to acquire accurate data based on a study of dropped or missed calls because calls that drop mid-conversation cannot be measured and certain factors affect whether a call will fail including: (1) type of phone; (2) time of day; (3) geographic location; (4) movement; (5) location in a building or a vehicle. (R. 146–47.) Wells also testified that to some extent the Application was a prospective move because the service deficiency is expected to get worse as the increased cellular demand approaches the limit of the Cellular bandwidth and Verizon is migrating to a system that will predominantly operate on the PCS bandwidth. (R. 146, 150.)

Verizon also presented the testimony of Vishwa Mithu, an RF engineer with Verizon Wireless who assisted with the computer modeling and confirmed Well's conclusions about the PCS deficiency and the ability of the proposed facility to remedy the deficiency. The Board requested that Mithu reconcile the existing service deficiency with the fact that, in 2005, he submitted an affidavit and testified at a hearing in support of the Silo Site application stating that it would remedy the Village's service problems. In response, Mithu submitted an affidavit stating that:

In 2005, I could not foresee the rate in which Verizon Wireless' cellular service at and around the Search Area would approach its maximum capacity, nor could I predict the advancements in technology and resultant need for data services over the PCS bandwidth. As such, the present customer demand, capacity issues, and need for PCS service in the Search Area were unforeseeable in 2005.

(R. 22.)

The only evidence affirmatively offered by the Board to refute Verizon's expert testimony and exhibits, were statements by members of the Board, who questioned the accuracy of the coverage deficiency data by noting that they did not experience any problems with their Verizon cellular service. In addition, the Board also relied on the absence of data documenting the frequency of missed calls as affirmative evidence that no coverage gap existed. Indeed, the Board appeared to give the absence of this data particular weight in light of the fact that Verizon had presented such data in connection with its Silo Site application.

The Board was not "bound to accept [Verizon's] expert testimony simply because ... it was insufficiently contested by properly credentialed expert testimony". *Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 533 (2d Cir. 2005). To refute the expert testimony, the Board could have presented its own expert testimony or evidence. It did not. The Board also could have questioned the experts credentials or the methodology used by the experts in arriving at their opinions. *Cf. id.* (noting that the "the Board was free to discount Omnipoint's study because it was conducted in a defective manner"). It did not. Rather, the Board's disbelief of the accuracy and adequacy of the expert's testimony and supporting data was largely

based on their own personal experience of not having a problem with dropped calls. For example, one member of the Board declared: "I've spent an awful lot of time in the white zone with my Verizon wireless and never ended". (R. 134.) Another member of the Board stated to Wells:

> [I]f you're driving around and dropping calls on Covert Avenue, sir, I submit you need a new phone because what you are saying we don't find is a reality. And I just don't know how to reconcile that.

(R. 145.) In addition, a resident of the Village disputed Well's testimony that it was difficult to gather accurate data on dropped and missed calls by stating that she had a bachelors degree in mathematics and knows that it is possible to put a number on the probability of lost calls. However, this resident was not qualified as an expert, nor did she perform any studies or submit any objective evidence.

Although the Board was not required to put forth its own experts, individual customer opinions about the adequacy of their service, which are "not based upon any objective evaluations or studies that [are] described in the record" are not enough to call into question Verizon's otherwise undisputed objective evidence. *MetroPCS New York, LLC v. Vill. of East Hills*, 764 F.Supp.2d 441, 454 (E.D.N.Y.2011); *see also Industrial Commc'ns & Electronics, Inc. v. O'Rourke*, 582 F.Supp.2d 103, 108–09 (D.Mass.2008) (holding that the opinion of seven neighbors that they have "good cell-phone coverage" were "not enough to call into question the studies presented by [the plaintiff]"); *Nextel Commc'ns of the Mid–Atlantic, Inc. v. Town of Sudbury*, No. 01–CV–11754, 2003 WL 543383, at *11–12 (D.Mass. Feb. 26, 2003) (holding that subjective evidence like a Board member's test drive around town placing calls on a cell phone to determine coverage was

not adequate rebuttal of the applicant's objective evidence).

■■■ Furthermore, the fact that Verizon did not present statistical data on dropped or missed calls also was not a valid basis for denying the Application. First, although the Code requires that a carrier demonstrate the existence of a coverage deficiency, the Code is silent as to what type of evidence is required. There being no affirmative obligation to submit statistical evidence of dropped or missed calls, the absence of such data cannot in and of itself impeach the credibility of Verizon's experts. *Verizon Wireless (VAW) LLC v. Douglas County, Kan. Bd. of County Comm'rs*, 544 F.Supp.2d 1218, 1245 (D.Kan.2008) (rejecting an argument that Verizon failed to provide substantial evidence of a coverage gap by not presenting statistical evidence of dropped calls in part because "the local zoning ordinances do not require a provider to submit statistical evidence of dropped calls in order to establish inadequate levels of service"). Indeed, by affirmatively relying on the lack of data showing dropped or missed calls, the Board disregarded Well's undisputed expert testimony that such evidence is not as accurate as the computer modeling and the drive tests in identifying a coverage gap.

Moreover, the fact that Verizon may have produced such evidence in defense of the Silo Site application does not make any less credible the evidence that it provided in support of the instant Application—*i.e.*, the testimony of two RF experts, propagation maps, and drive test data. *Vill. of East Hills*, 764 F.Supp.2d at 454 ("Insofar as Mr. Comi disagrees with Metro's determination of a coverage gap, his opinion is not based upon any objective evaluations or studies that he described in the record. The failure of Metro to introduce its customers' testimony of poor Metro coverage

in the area, in and of itself, is not fatal to the application given the evidence of a gap that Metro Provided."); *New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals*, No. 08–CV–4833, 2010 WL 3937277 (E.D.N.Y. Sept. 30, 2010) (holding that the testimony of Verizon's RF expert, affidavits, and propagation maps satisfied its burden of demonstrating a coverage gap and therefore the town board's decision based on the fact that a single Verizon customer testified at the hearing that he had good coverage and Verizon "did not offer any testimony from customers with poor signal" was not supported by substantial evidence).

A review of the record indicates that the Board's denial on the grounds that no service deficiency existed was not based on an objective review of the evidence, but was guided by a general resentment by the Board members who felt that they had been hoodwinked by Verizon's previous representations in conjunction with the Silo Site application. The Board ignored Verizon's expert testimony explaining how at the time of the Silo Site application, Verizon could not have known that the increase in demand and advances in technology would require another facility to service the Village. In addition, the Board credited the unverified, untested, anecdotal statements by Board members and residents about their personal coverage experience over the detailed and extensive expert testimony and evidence regarding the existence of a service deficiency in the Floral Park search area. Finally, it was not reasonable for the Board to rely on the absence of a particular type of data that was not required to be produced, especially in light of the uncontroverted expert testimony about why such data is inaccurate, and why the data provided by computer modeling and drive tests were superior.

### b. Coverage Gap in the Village

Even assuming that Verizon was able to show that a coverage gap existed in the Floral Park search area—which it did—the Board nevertheless contends that Verizon failed to meet its burden because the evidence showed that the "vast majority of the Village" had adequate PCS coverage. However, there is no provision in the Code that requires a particular percentage of the coverage gap to be located within the Village in order for a wireless provider to obtain a special use permit. Rather, the Code specifically states that in order to warrant a modification from the minimum height requirement the applicant must show "that the modification is necessary . . . to meet the coverage requirements of the *applicant's* wireless communications system." Code § 99–28.21(B)(4) (emphasis added). As stated above, Verizon met its burden of showing a service deficiency in its "wireless communications system" and therefore met this requirement. *Cf. MetroPCS New York, LLC v. City of Mount Vernon*, 739 F.Supp.2d 409, 418, 420 (S.D.N.Y.2010) (holding that where the applicable town zoning code provided that "[a]ll applications for the installation of a new wireless facility must include documentation that 'demonstrates the need for the . . . facility to provide service primarily and essentially within the City with service to adjacent municipalities to not exceed 40% of the total area to be covered by the proposed facility'", MetroPCS satisfied the criteria by providing evidence that "more than 60% of the proposed coverage would fall within Mount Vernon"). Furthermore, to the extent the Board argues that its jurisdiction "is confined to property and persons within the territorial limits of the village", (Defs.' Reply Br. at 4 (citation omitted)), it is undisputed that, although not a majority, at least some portion of the residents of the Village will benefit from the proposed Facility.

Moreover, although not cited as a ground for rejecting the Application in the Denial, the Board asserts that it maintains the authority to reject an application that is otherwise compliant with the Code if it determines that the proposal would not benefit its residents. Thus, because the vast majority of the coverage gap is outside the borders of the Village, the Board contends that its' denial of the Application was valid. Again, the Court disagrees.

 It is well-settled that, under New York law, when a zoning board is deciding whether to grant a public utility an area variance "[l]ocal concerns, though important, are not the sole criteria". *Consolidated Edison Co. of New York, Inc. v. Hoffman*, 43 N.Y.2d 598, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978). Contrary to the Board's contention, there is no authorization in the Code or in the state law that identifies the size of the benefit to the community as a relevant consideration in assessing a public utility's application for an area variance. Rather, under the public utility standard, the requisite inquiry is whether the "facility presents a minimal intrusion on the community". *Independent Wireless One Corp. v. City of Syracuse*, 12 A.D.3d 1085, 784 N.Y.S.2d 473 (N.Y.A.D. 4 Dept.2004) (quoting *Site Acquisitions, Inc. v. Town of New Scotland*, 2 A.D.3d 1135, 770 N.Y.S.2d 157 (3d Dep't 2003), citing *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 373–374, 604 N.Y.S.2d 895, 624 N.E.2d 990). Moreover, "where the intrusion or burden on the community is minimal, the showing required by the utility should be correspondingly reduced." *Hoffman*, 43 N.Y.2d at 611, 403 N.Y.S.2d 193, 374 N.E.2d 105.

 Here, the uncontroverted evidence in the record establishes that any intrusion on the community will be minimal. As previously stated, Verizon presented expert testimony, technical reports, and data demonstrating that the Facility will be camouflaged to blend in with the building; it will have a minimal impact on noise levels; it will not affect property values; and it does not present any validly considered environmental or health concerns. There was no meaningful objective evidence to the contrary.

In addition, the Court notes that the fact that the Village admittedly benefits from telecommunications facilities located in the surrounding communities undermines the Board's contention that a village zoning board should only approve a telecommunications facility that addresses a service deficiency within the borders of its village. At the hearing, the Board acknowledged that the Village's wireless service benefits from the existence of telecommunications facilities located outside of the Village boundaries. (*See* R. 137–38 (question by a board member confirming that the propagation map showed that other than one underserved area, the balance of the Village is "adequately serviced" by the Silo Site, a facility in Elmont, and overlapping from other facilities).) Indeed, as discussed below, one of the Board's stated reasons for denying the Application was the viability of a municipal Water Tank (referred to as the municipal water tower in the Denial) (the "Water Tank") as an alternative location for constructing the Facility. This argument is predicated entirely on the notion that, while the Water Tank may be insufficient to cure the coverage gap in the entire Floral Park search area, it would cure the coverage gap in the Village. However, as the Board admits, the Water Tank is located *outside* of the Village, in the neighboring town of New Hyde Park.

The fact that the Board itself has acknowledged that cell sites located in the neighboring communities provide coverage within the Village, and puts forth as a

viable alternative a property located outside of the Village, reinforces the Courts finding that the Board did not rationally base its opposition on objective evidence. Rather, the attempt to deny the Application because an undefined portion of the coverage gap lays outside the boundaries of the Village is a classic example of the "not in my backyard" problem whereby "property owners resist new facilities in populated areas because they find wireless facilities unsightly and worry facilities lower property values; yet as cell phone consumers these same people want quality service where they are most." *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 51 n. 9 (1st Cir.2009).

Thus, the Court finds that Verizon met its burden of showing a need for the Facility to meet a service deficiency and the Board's denial on this ground, which was not based on any requirement in the state or local zoning laws, was not supported by substantial evidence.

### F. Alternative Sites

██ Finally, the Board argues that Verizon did not establish a need for the special use permit because it did not establish that constructing the Facility on the Building was the "least intrusive and only feasible plan" for closing the coverage gap. However, contrary to the Board's contention, on a substantial evidence claim like the one Verizon asserts, a public utility is not required to show that its proposed telecommunications facility is the "least intrusive or only feasible plain" of closing a coverage gap. The case relied upon by the Board, *New York SMSA Limited Partnership v. Inc. Village of Mineola*, No. 01–CV–8211, 2003 WL 25787525 (E.D.N.Y. 2003) does not compel a different result. Contrary to the Board's interpretation, the court in *Village of Mineola* held that the burden is on an applicant to "develop the record to include evidence that the proposed siting is the least intrusive and only feasible plan" in the context of a prohibition claim under section 332(c)(7)(B)(i)(II) of the TCA, not a substantial evidence claim. 2003 WL 25787525, at *5.

In fact, the Second Circuit addressed this distinction in *Omnipoint Communications, Inc. v. City of White Plains*, 430 F.3d 529 (2d Cir.2005). In *White Plains*, the Second Circuit held that requiring a carrier to establish public necessity by showing that the plan would close a coverage gap in the "least intrusive means" was the "wrong test" on a substantial evidence claim because the "least intrusive means" requirement "addresses the showing an applicant must make before TCA § 332(c)(7)(B)(i)(II) will *require* a planning board to grant its application". *City of White Plains*, 430 F.3d at 535 (emphasis in original). By contrast, the applicable standard on a substantial evidence claim is the public necessity standard under New York law "which concerns the showing that a utility must make under New York law before a zoning board *may* grant a use variance". *Id.* (citing *Consolidated Edison v. Hoffman*, 43 N.Y.2d 598, 611, 403 N.Y.S.2d 193, 374 N.E.2d 105 (1978)). To establish public necessity, the carrier must demonstrate not that the proposed facility was the "least intrusive means", but rather that the proposed facility was "*more* feasible than other options". *City of White Plains*, 430 F.3d at 535 (emphasis added).

██ It is well-settled in the Second Circuit that "local governments may reasonably take the location of the telecommunications [facility] into consideration when deciding whether ... to approve an application for construction of wireless telecommunications facilities...." *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 639 (2d Cir.1999). To that end, "[a] local board is justified in considering the avail-

ability of alternatives that might create less disruption to the community's zoning plan." *New York SMSA L.P. v. Town of Oyster Bay Zoning Bd. of Appeals,* No. 08–CV–4833, 2010 WL 3937277, at *6 (E.D.N.Y. Sept. 30, 2010). Here, the evidence in the record reflects that Verizon made a good faith effort to evaluate alternative sites and satisfied the public necessity standard of showing that constructing the Facility on the Property was "more feasible than other options".

First, Verizon presented undisputed evidence that two of the alternative sites considered that were located within .5 miles of the Property, outside the boundaries of the Village—(1) the Sewanhaka High School (the "High School") and (2) the property owned by the Village of Stewart Manor and utilized as the Fire Department (the "Fire Department") and the Village of Stewart Manor Village Hall (the "Village Hall", collectively with the Fire Department, the "Village of Stewart Manor Property")—were not available because the High School was unwilling and the Village of Stewart Manor Property was unable to enter in to a lease agreement with Verizon. Although the Board questioned why Verizon did not spend a "million dollars" trying to change the minds of these property owners rather than seeking a special use permit for the Property, the Board did not present any evidence that either of these sites were feasible substitutes. (R. 131.)

Next, the record reflects that Verizon evaluated the possibility of placing the Facility on the municipal Water Tank, which was located approximately .6 to .7 miles from the Property, outside the boundaries of the Village in New Hyde Park. Although the record indicates that placing the Facility on the Water Tank would close the portion of the coverage gap located in the Village, Verizon rejected the Water Tank as a viable alternative because it was too far north to remedy the service deficiency in the entire Floral Park search area and it would create an interference with Verizon's existing facilities. To the extent the Board denied the Application on the grounds that the Water Tank was a viable alternative because it would have cured the portion of the service deficiency located in the Village, as stated above, this ground for denial is not supported by substantial evidence. Also, as previously noted, Verizon provided evidence demonstrating that adding to the existing Silo Site would not cure the service deficiency because the PCS bandwidth did not extend as far as Cellular bandwidth.

Finally, during the course of the hearing, the Board questioned one of Verizon's experts about the possibility of placing the Facility on a one-story garage owned by Verizon that is located .25 miles from Property on Covert Avenue (the "Verizon Building"). In response, the expert stated the Verizon Building was too far north to close the coverage gap. However, unlike with the other alternative properties that Verizon considered, there was no evidence submitted supporting this conclusion. The Board did not further question the expert, request any additional information, or present any affirmative evidence that the Verizon Building was a viable alternative site. According to Verizon, the Verizon Building is not a viable alternative because, like the Property, it is less than 50 feet tall and therefore under the Code would also require Verizon to obtain a special use permit for a height modification. Nevertheless, the Board argues that substantial evidence supported its denial because Verizon's failure to present affirmative evidence about why the Verizon Building was *not* a viable alternative demonstrated that it did not diligently examine alternative sites.

However, there is no requirement in the Code that Verizon evaluate every potential location where the Facility hypothetically could be constructed, and submit evidence showing why each site is not a viable alternative. In fact, to the extent the Code requires any affirmative evidence that alternative sites were evaluated, the Code not only limits the relevant properties for consideration, but it only imposes the requirement on applicants seeking to construct a tower, not facilities on antenna support structures.

In particular, the Code requires an applicant who seeks a permit to construct a *tower* to submit affidavits and technical evidence showing that the "applicant made diligent, but unsuccessful, efforts to obtain permission to install or collocate the applicant's telecommunications facilities on ... towers or usable antenna support structures located within a one-half-mile radius of the proposed tower site". Code §§ 99-28.6(C)(5), (6), and (7). Thus, Verizon was not required under the Code to submit any affirmative evidence relating to its evaluation of all alternative sites within a half mile radius of the Property.

Nevertheless, even assuming that the tower modification requirements in the Code were also applicable to facilities on antenna support structures, Verizon still was not required to present evidence explaining why the Verizon Building was not a viable alternative because it was not a "*usable* antenna support structure". According to Verizon, and seemingly undisputed by the Board, the Verizon Building is less than 50 feet tall. Thus, under the Code, the Verizon Building is not a "usable" antenna support structure because Verizon would have to obtain the same special use permit for a height modification in order to construct the Facility. Neither for that matter, would the Verizon Building qualify as a "feasible option" under the public necessity standard. In order for Verizon to determine whether the Verizon Building was a viable alternative, they would have to undergo the same application process to obtain a special use permit as they went through with the proposed Facility, the approval of which is far from certain.

Notably, the Board focuses only on Verizon's failure to evaluate the Verizon Building, and seemingly disregards all of the other one story commercial buildings within .5 miles from the property, which, as John Gomez, a site acquisition consultant for Verizon testified at the hearing, make up the vast majority if not all of the buildings north of the Property on Covert Avenue. (R. 106.) Under the Board's theory, in order to obtain a special use permit to construct the Facility on the Property, Verizon would have had to affirmatively introduce evidence showing that it had evaluated and ruled out each and every one-story commercial building on Covert Avenue, despite the fact that it may never be able to obtain a special use permit to actually "use" the building as an antenna support structure. The Court does not read the Code, or the public necessity standard, to impose such an extensive and unduly burdensome requirement on a wireless provider.

The record reveals a good-faith effort by Verizon to evaluate viable alternative sites, and there was no requirement or request for Verizon to submit additional materials regarding the Verizon Building. Accordingly, the Board's denial on this ground is not supported by substantial evidence.

### G. *Article 78*

■ Article 78 of the New York Civil Procedure Law and Rules provides that a party is entitled to relief from a local zoning decision that is "arbitrary and capricious" or is not supported by substantial

evidence. N.Y. C.P.L.R. §§ 7803(3) and (4) (McKinney 2008). Although "Article 78 imposes its own requirement that local decisions be supported by substantial evidence" the test for relief from a zoning board's decision under Article 78 "'is essentially the same as that under the TCA.'" *T–Mobile Northeast LLC v. Town of Ramapo,* 701 F.Supp.2d 446, 461 (S.D.N.Y.2009) (quoting *Omnipoint Commc'ns, Inc. v. Common Council of City of Peekskill,* 202 F.Supp.2d 210, 226 (S.D.N.Y.2002)).

Having found that the Board's denial not only was not supported by substantial evidence under the TCA, but also was primarily based on considerations that had no basis in the Code or the applicable state law, the Court finds that the denial was also unsupported by substantial evidence and arbitrary and capricious in violation of Article 78. *See Nextel Partners, Inc. v. Town of Fort Ann,* 1 A.D.3d 89, 94, 766 N.Y.S.2d 712 (3d Dep't 2003) (holding that because Nextel "made the requisite showing to warrant the approval of its variance request, ... the Town Board's denial of the application was arbitrary and not rational").

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED,** that Verizon's motion for summary judgment is GRANTED, and it is further

**ORDERED,** that the Board's cross-motion for summary judgment is DENIED, and it is further

**ORDERED,** that the Board shall, within 30 days of the date of this order, grant Verizon's Application and issue the special use permit and such other permits or licenses which are necessary to effectuate the construction of the Facility that is the subject of this action, and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**